## Rohart v. Jim Thorpe Area
## Board of School Directors

*A. Martin Herring,* for appellant.
*William F. Kershner,* for appellee.

LAVELLE, *P.J.,* February 2, 1981—Kristine Rohart, a certified and tenured teacher of the French language, appealed to this court from her suspension by the Jim Thorpe Area Board of School Directors (board) pursuant to the provisions of the Local Agency Law, 2 Pa. C.S.A. § 105. We dispose of this appeal based on the certified record of the proceedings held before the board.

Appellant was suspended from her position by the board prior to the 1979-80 school year. After hearing before the board on November 12, 1979, an

adjudication was filed on July 7, 1980. It is from this adjudication that appellant takes her appeal.

## DISCUSSION

The scope of our review in this type of case is circumscribed by the Local Agency Law, 2 Pa.C.S.A. §754(b), which requires that we must affirm the action of the local school board unless we find a violation of the constitutional rights of the appellant, an error of law, procedural irregularities, or that any necessary finding of fact made by the agency is not supported by substantial evidence. See Gabriel v. Trinity Area School District, 22 Pa. Commonwealth Ct. 620, 350 A. 2d 203 (1976).

We begin with the basic legal proposition that a professional school employe may be suspended only for the reasons listed in section 1124 of the Public School Code of March 10, 1949, P.L. 30, as amended, 24 P.S. §11-1124. A suspension for any other reason is invalid and will result in the reinstatement of the professional employe, with back pay, even if his former position has been abolished: Sporie v. Eastern Westmoreland Area Vocational-Technical School, 47 Pa. Commonwealth Ct. 390, 408 A. 2d 888 (1979).

Here, appellant was suspended pursuant to section 1124(2) which provides:

"Any board of school directors may suspend the necessary number of professional employees, for any of the causes hereinafter enumerated: . . .

"(2) Curtailment or alteration of the educational program on recommendation of the superintendent, concurred in by the board of school directors, approved by the Department of Public Instruction, *as a result of substantial decline in class or course*

*enrollments or to conform with standards of organization or educational activities required by law or recommended by the Department of Public Instruction. . . .*" (Emphasis supplied.)

Appellant argues that the curtailment of the French program of Jim Thorpe Junior-Senior High School did not result from the requisite "substantial decline in class or course enrollment" and therefore her suspension is invalid. The board argues that voluntary enrollment in the French program did suffer substantial decline in the first year or seventh grade enrollment. The board further argues that even if there was no substantial decline in enrollment, French was dropped, "to conform with the standards of organization or educational activities required by law. . . ."

For the reasons set forth herein, the court finds that appellant was properly suspended.

## I.  Substantial Decline

The Superintendent of the Jim Thorpe Area School District, Dr. C. Elwood Huegel, recommended to the board that the subject of French be discontinued for the following reasons which he stated on the record before us:

"For the past several years, there has been a decided lack of interest on the part of seventh and eighth grade students to select French as their first choice of a foreign language. This is borne out when you look at the enrollment figures which you have in front of you.

"Please note that in the past three years, including the selections made this past Spring, for the 1979-1980 school year, anywhere from ten to thirteen students had to be placed in French classes in

order to equalize the teaching loads of the members of the foreign language department.

"In addition to the above reason, in arriving at my recommendation, I gave consideration to the fact that a large number of families in the district are of German descent; therefore, I felt that German would be of more value to our students than French."

In support of its approval of appellant's suspension based on substantial decline in course enrollment, the board argues that voluntary enrollment in first year French or the seventh grade decreased from 15 in 1977-78 to nine students in 1978-79. However, it is unclear from the record whether the figure "15" represents only voluntary enrollment or total enrollment in first year French, including voluntary and involuntary students.[1] As it stands, the

1. "Q Could you tell the Board—for instance, beginning with the '78-'79 school year—how many students were enrolled in French?

A Sixty-nine (69) for the '78-'79 school year.

Q And how many in the '77-'78 school year?

A Fifty-nine (59).

Q So that the number of students from '77 to—rather, let me rephrase that. The number of students from the '77-'78 school year to the '78-'79 school year went up ten, is that correct?

A Not exactly.

Q Well, the difference between 59 and 69, as I calculate it, is ten.

A Except that we had to place twelve students in the '78-'79 to bring it up to 69. There were only nine who chose French in seventh grade. In '78-'79, we provided a class of 21 for Mrs. Rohart. We placed twelve in it to bring it up to equalizing load.

Q How many were in German in '77-'78?

A Twenty-nine (29). There were fifteen (15) in French.

record shows there was a total of 21 students, including 12 involuntary students, in the first year French class in 1978-79, a significant increase of students above the total of 15 in 1977-78. The record also shows an increase in schoolwide French voluntary enrollment from 59 in the 1977-78 school year to 63 in the 1979-80.

Q Now, if I—I lost you. I believe you said there were 59 students in '77-'78 in French.

A I was talking only seventh grade. In '77-'78 in German, there were 84, as opposed to 59 in French.

Q Okay. And in '78-'79 in German?

A There were 67 in German.

Q And how many were there in the—if you have the figures for '79-'80 school year that signed up for French?

A Sixty-three (63).

Q Voluntarily?

A Correct.

Q How many signed up for German in the '79-'80 school year?

A Seventy-seven (77).

Q Am I correct that you had a drop of six students between the '78-'79 school year and the '79-'80 school year in French?

A If you're using the figure 69 in '78-'79, Mr. Herring, in '78-'79 we had to put twelve in there. There were only 57 who signed up in '78-'79 voluntarily. I think we ought to compare apples to apples.

Q All right. Let's use this number in '78-'79 for French. Is it not then correct that you had an increase from 57 to 63 between the '79 school year and the '78 school year?

A Yes, but the student enrollment also increased in the Sr. High School.

Q So, you had an increase in the student enrollment in the Sr. High School, and you had an increase in French; but, yet you came to the conclusion that there was a decline in the French program, am I correct?

A In the number of youngsters voluntarily selecting it, there were fewer selecting French than there were selecting German."

The record is obviously incomplete.[2] However, because we decide the case on another basis, it will not be necessary to remand for the purpose of completing the record.

## II. Conformity to Standards Required by Law

Section 1124(2) of the code permits teacher suspension if a school program is curtailed "to conform with standards of organization or educational activities required by law. . . ." This language has been interpreted by the Commonwealth Court to permit suspension of a teacher if there is substantial evidence on the record that the alteration or curtailment of the educational program which results in the suspension of the teacher is "motivated solely by a desire to provide a more efficient and effective school program." Sporie, supra, 47 Pa. Commonwealth Ct. at 396, 408 A. 2d at 892.

In Sporie, the agricultural program was eliminated at a vocational-technical school even though there was no decline in student enrollment. A professional employe, certified to teach agriculture, was suspended. The Commonwealth Court affirmed the suspension because the decision to eliminate the agricultural program was based on surveys which revealed that the agriculture course was not a first preference among high school students, and that one-third to one-half of those students who began the course never finished it and transferred to their first preference as soon as an opportunity arose. The record also showed that all

---

2. Apparently a chart used at the hearing before the board was not admitted into evidence and therefore we do not have the benefit of considering the statistical data in the chart as the board did.

students interested in agriculture could be accommodated at other schools.

The Sporie court held that under these circumstances it was reasonable to eliminate agriculture and therefore suspension of the agriculture teacher was proper.

In the instant case, it was the unrefuted testimony of Dr. C. Elwood Huegel that students had to be placed involuntarily in the French program in order to balance the teaching loads among the teachers in the Foreign Language Department. In short, the problem faced by the Jim Thorpe Junior-Senior High School was an inequitable teaching load among the teachers of the Foreign Language Department.

In 1978-79 the first year French class of nine voluntary students was comparatively small. In order to solve this problem, this class was filled out by 12 students who had no desire to take French. Thus, in 1978-79, 12 out of 21 or 57 percent of all first year French students in the Jim Thorpe Junior-Senior High School were required to take French involuntarily. Apparently, finding this involuntary shifting of students to be unsatisfactory, the board decided to curtail the French program because of the continuing problem of small first year French classes.

As in Sporie, supra, so here there was no evidence produced by appellant that the board had ulterior motives or wished to "accomplish the dismissal of a teacher for arbitrary or political reasons."

Further, Spanish and German remain as alternate choices of language for the students of Jim Thorpe Junior-Senior High School and the availability of these languages satisfies board of education requirements.

Thus, the board's desire to halt involuntary placement of students and also to solve the problem of an inequitable teaching load leads us to conclude that there is substantial evidence that the curtailment of French by the board was motivated by a desire to provide a more efficient and effective school program. Whether the board's action will in fact provide a more efficient and effective school program is not for this court to decide.

### III. Approval by Department of Education

We note that section 1124(2) of the code requires approval of the French curriculum's curtailment by the Department of Public Instruction. In response to a request by the Superintendent of Schools for approval of the change, the Department of Education stated that the curriculum change did not require their approval.

In our view, the Department of Education was incorrect in the conclusion that its approval was not required. However, because the superintendent requested approval and because the department disclaimed any need on its part to approve the change, we cannot conclude that it disapproved the proposed curriculum change. We are therefore satisfied that the approval requirement of section 1124(2) has been met. See Sporie, supra.

Accordingly, we enter the following

### ORDER

And now, February 2, 1981, it is hereby ordered and decreed that the suspension of Kristine Rohart by the Jim Thorpe Area Board of School Directors be, and is hereby affirmed.